[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE AND HISTORY OF PROCEEDINGS:
The is the case of Christina N., whose date of birth is December 23, 1986, and who is the subject of a petition to terminate the parental rights of Mark L., her acknowledge father, and Lisa N., her mother.
Christina was adjudicated to be a neglected child and committed to the custody of the Commissioner of the Department of Children and Youth Services ("Commissioner") on September 15, 1988. She has been in foster care ever since that date.
On May 17, 1989 the Commissioner filed a termination petition with the court alleging grounds of abandonment by father, and failure to rehabilitate and acts of commission or omission by both parents. The petition was last amended on January 16, 1991 to CT Page 1735 reflect facts occurring up to the time of trial. The trial was conducted over a two day period on January 16 and 17, 1991.
FACTS:
Evidence offered at trial, interpreted in the light of the prior record in this court concerning these children, of which the court has taken judicial notice, permits the finding of the following facts:
On December 23, 1986 Lisa N., who was living with Mark L. at the time, gave birth to Christina. No father was named on the child's birth certificate. Mark did not acknowledge paternity of Christina until June, 1990, when the child was three and one half years old.
The Department of Children and Youth Services ("DCYS") first became involved with this family in 1987 when the agency investigated referrals of domestic violence between Lisa and Mark. It was subsequently determined that Lisa is mentally handicapped and, as a result, numerous community and state operated services have been offered to her in an effort to assist her in developing parenting and personal management skills. These services included referrals to: The Department of Income Maintenance for food stamps and aid to families with dependent children; The Department of Human Resources for help with housing needs; The North East Action Committee for emergency food and clothing needs; the WACAP shelter for emergency housing; The Youth Service Bureau for parent aide assistance; the Day Kimball Hospital OB/GYN clinic; the Young Parents Program for child care counseling; and the Department of Mental Retardation ("DMR").
On May 15, 1988 a neglect petition was filed with the court alleging that Christina was being denied proper physical and medical care. The child was adjudicated neglected and committed to DCYS for a period not to exceed eighteen months on September 15, 1988. That commitment was extend by the court effective March 15, 1990, for an additional period not to exceed eighteen months.
At the time of the adjudication and commitment of this child in September 1988, Mark was living with Lisa and Christina and, although he was neither the legal nor acknowledged father of Christina, he was named as a respondent in the neglect petition. When he chose not to acknowledge paternity of the child at the initiation of the neglect proceeding he was permitted to withdraw from those proceeding and his name was ordered stricken from the petition by the court (Potter, J.).
CLINICAL EVALUATIONS: CT Page 1736
Two court ordered psychological evaluations were conducted in this case by Dr. Robert Meier, a licensed clinical psychologist. The first evaluation was of Christina and Lisa and was conducted on August 16, 1988. While Lisa did not exhibit any emotional difficulties, she was found to be mildly retarded with an I.Q. of 65. Her behavior and approach to her environment is that of an eight or nine year old.
Dr. Meier found Lisa's knowledge of general information to be very low. For example she did not know the purpose of a thermometer, she did not know what to do in the event of observing smoke in a movie theater, and she did could not remember the name of Christina's physician.
While Dr. Meier found a strong parent-child relationship between mother and child, Lisa was observed to have little understanding of the needs of the child. She was also mostly passive in her relationship with the child. (Testimony of Dr. Meier). Lisa also indicated to Dr. Meier that her seventeen year old sister was providing much of the child care for Christina at that time. She gave no indication that Mark L. was providing her with any assistance with the child.
A portion of Dr. Meier's report contained in Exhibit E, is reproduced for emphasis.
 In general, [Lisa N.] is a young woman of very limited mental ability. She has little comprehension of child care and is able to make only elementary decisions regarding her children. She is functionally illiterate and it is unlikely that she will be able to respond appropriately without a great deal of assistance through any crises, illness or social problems faced by these children.
Dr. Meier second evaluation was conducted on July 26, 1990 and included Lisa, Mark and Christina.
Dr. Meier found no significant difference in Lisa's level of functioning between the first and second evaluations. He observed a parent-child relationship but noted that mother still lacked an understanding of the child' needs and did not respond appropriately to Christina during the evaluation. (Exhibit F). For example, during the July, 1990 evaluation Christina had a temper tantrum and mother had absolutely no idea what to do with respect to that behavior. (Testimony of Dr. Meier).
Dr. Meier stated that Lisa loves and cares for Christina but cannot put that love into parenting practice. He testified that it is unlikely that Lisa, even with support services, will be able to develop the ability or capacity to properly or adequately CT Page 1737 independently care for Christina. When Lisa was asked during the trial what she needed to do to be able to care for the child, her only response was, "I need to do some things." She does not know what those "things" are.
Lisa also stated to Dr. Meier that Mark had not had any visits with Christian. (Exhibit F). This was consistent with Mark's statements to Dr. Meier during the psychological evaluation but contradicted Mark's testimony.
Dr. Meier also conducted an evaluation of Mark who indicated that he had concerns about Lisa being able to care for Christina. He was found to be rebellious, immature and self centered. Dr. Meier noted that Mark had little interest in the child and had assumed no major responsibility for her throughout her life. Father made no mention of ever having seen or visited with Christina or ever having provided for her welfare or well being.
Dr. Meier observed no parent-child relationship between father and daughter. Mark had little knowledge of Christina's "behavior, academic evaluations or medical history. There was no indication of affection between father and daughter.
Christina was found to be a child who does not appear to learn well. There are indications that she "lacks sensitivity to the feeling of others and feels little responsibility or guilt when the does something wrong." (Exhibit F). Dr. Meier testified that Christina is a child with special behavioral and emotional needs.
Some of Dr. Meier's findings contained in Exhibit F are presented for emphasis.
 Neither mother or father indicated an awareness of the need for services. [Mark] shows a very limited understanding of the child's behavior, and was unable to provide any evidence of having considered necessary services. Mother has engaged in services in the past, but her involvement was inconsistent. She seems to [have made] poor use of the services in the past, and shows no motivation to continue with them.
 Father's lack of involvement with Christina, the absence of an effective parent/child relationship, and lack of reasonable behavior on his part limit his ability to provide effective parenting.
 At the present time placement of Christina in an adoptive home where she can be given the specialized attention and care that she needs is recommended.
Mother has shown little change or improvement since the previous CT Page 1738 evaluation almost two years earlier. Given the child's special needs and mother's inability and failure and adequately rehabilitate, permanent with mother is not recommended. (Emphasis added).
The court finds the observations and opinions expressed by Dr. Meier in his reports and testimony to be credible, and has given considerable weight to his opinions and findings. "Psychological testimony is rightly accorded great weight in termination proceedings." In re Juvenile Appeal (anonymous), 177 Conn. 648, 667
(1979); In re Nicolina T., 9 Conn. App. 598, 605 (1987).
Both prior and subsequent to the commitment of the child DCYS made considerable efforts to assist mother to increase her parenting skills. Between December, 1986 and March, 1990 one or more parent aids met with Lisa twice per week to assist her in developing those skills. Ms. Nash, one of Lisa's parents aides, testified that Lisa showed little or no improvement over the two year period during which she worked with her. In addition, after the child was committed in September, 1988, DCYS established an additional program for Lisa involving Christina and the child's foster mother in an attempt to teach parenting skills to mother. Lisa visited with Christina at the foster home for one hour to one and one half hours each week form November 1988 until September, 1990, during which time the foster mother attempted to teach Lisa how to care for the child. Ms. Kudzal, the foster mother testified that Lisa did not significantly improve in her ability to parent this child over the almost two years she worked with her.
Unsupervised visits were to begun between Lisa and Christine in approximately November, 1989 at Lisa's apartment. Several incidents occurred during those visits which resulted in the unsupervised visits being terminated. On one occasion the child was returned to the foster home without her ski pants on in cold (15 to 20 degree) weather. Her legs were chaffed and the foster mother was concerned about the health. On another occasion the child was returned home with her clothes soaking wet following a visit.
The final incident happened after an overnight Christmas visit when, according to the foster mother, the child was returned to the foster home with a temperature of 104.3 degrees. Mother seemed to be unaware of the child's condition, and the child's father, who apparently was at Lisa's apartment at the time, testified that other than a slight cold, he did not see anything wrong with the child that day. Mother denied these reported incidents; however, the court finds the testimony of the foster mother to be credible.
The court finds it interesting and significant that both Lisa's parent aide, Ms. Nash, and her DCYS social worker, Ms. Rudin, testified that at separate times Lisa told them that did not believe CT Page 1739 that she could care for Christina by herself. That testimony is given support by the fact that on May 30, 1990 Lisa voluntarily signed a consent form to terminate her parental rights to Christine, even though she subsequently withdrew that consent.
When asked during the trial whether Christina had any special or emotional needs, Lisa did not know of any special needs or problems. When asked how she would address the concerns raised by Dr. Meier with respect to the child's inability to establish relationships with others she answered that Christina has an emotional relationship with her and that she would sit down and talk with Christian about establishing relationships with others. Mother really has not idea or understanding that the child has any developmental, special or emotional needs or problems, much less how to go about resolving those matters.
Mark claimed that he was upset when the child was committed to DCYS and that he was unaware that Lisa was not properly caring for the child, even though he was living with them at the time. He was unable to say during his testimony why he had done nothing to provide a come for Christina or present himself as a resource for the child subsequent to her commitment. He also had no reasonable explanation why he waited until June of 1990 to acknowledge paternity of the child. He admitted that he never asked DCYS for the right to visit with Christina form the time of her commitment in September, 1988 until June of 1990. He stated that he did not have to ask for visitation since he was visiting with the child without DCYS knowing about it. He also claimed to have bought the child gifts and presents and that they have a good parent-child relationship. Mark never mentioned any of these matters to Dr. Meier during the evaluation interview and his perception of his relationship with Christina is totally contrary to that observed by Dr. Meier. The court does not find father's testimony to be particularly credible.
Father did not visit with Christina, nor did he seek to do so, from January, 1990 until at least June, 1990. Even prior to that time the most he could have visited was during the unsupervised visits Christina had with Lisa during November, 1989 and January, 1990, and by father's own admission he did not see the child on every one of those unsupervised visits. There was no contact between father and child between September, 1988 and approximately November, 1989. At the time of trial Lisa and Mark were living together in a two bedroom apartment.
Four employees of the Department of Mental Retardation testified that they have been giving services to Lisa for a considerable period of time. Barbara Morse of DMR testified that Lisa has shown "a lot of progress: but that she needs to be taught to care for her child in very specific terms. For example, she has to be provided CT Page 1740 with specific times of the day to feed, bathe, and clothe the child. Indeed, everything she does must be spelled out in concrete terms. She will be unable to adequately care for the child without substantial "hands on" assistance from others for years, at best.
Dorothy Blocker of DMA has provided Lisa with help with planning and daily living including laundry and grocery management. She testified that Lisa has made slow progress over the past one and one half years but with some periods of regression. She needs help on a consistent basis. Ms. Blocker also testified that in her opinion Mark was a negative influence upon Lisa and that he impeded her progress.
Dianne Stoyanovich of DMR testified that she has been providing Lisa with money and marketing management help for about one year. Lisa has shown improvement but still needs a lot of supervision and will continue to need supervision for the foreseeable future.
Finally, Gene Carresciaa, DMR vocational rehabilitation counselor, testified that Lisa has held only one job, and that was for two months between February and April, 1990 at a McDonalds restaurant. She left by mutual consent because of attendance difficulties.
Despite receiving and needing all of these services over the years, Lisa testified that she believes that she can adequately and safely care for Christina by herself and without the assistance of DMR, stating, "I believe I can do it without them". It is clear to the court that she cannot.
ADJUDICATION: — as of January 16, 1990.
ABANDONMENT:
The Connecticut General Statutes sections 17-43a(b)(1) defines abandonment as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred." In Re Rayna N., 13 Conn. App. 23, 36
(1987).
The court finds clear and convincing evidence that the respondent father has abandoned this child, as that term is defined by statute, and that this condition has existed for more than one year.
Mark has not shown not shown nor maintained any reasonable degree CT Page 1741 of interest concern or responsibility in or for this child since at least the date of her commitment in September, 1988. This is a father who admittedly did not acknowledge paternity of nor support his child until she as three and one half years old. His interest in and concern for the child was so minimal that, according to his own claim, he did not even know that she was not being properly cared for as of September, 1988, when she was adjudicated to be neglected and committed to DCYS. His interest in the child was so minimal that he sought to be relieved form participating the the child's neglect proceeding by refusing to acknowledge paternity of the child. And, for more than one and one half years, from the Fall of 1988 until the Spring of 1990, during which time his daughter was living in foster care, he did absolutely nothing significance to provide her, to seek approval of DCYS to visit with or, or to seek to make a home for her. This is a father who, except for a court ordered evaluation, has not seen nor sought to visit with his child since January, 1990. That pattern of behavior, and lack of interest and concern, clearly and convincingly constitutes statutory abandonment!
ACTS OF OMISSION NOR COMMISSION:
In order to terminate parental rights on the ground of acts of commission or omission under Section 17-43a(b)(3) the court must clearly and convincingly find that the child was guidance or contrail necessary for this physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the parent.
The court finds that the petitioner has not proven, by clear and convincing evidence, that the father or the mother, by an act of commission or omission, caused the child to suffer deprivation of any necessary care. Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267
(1984).
This is a child who has been in foster care for the past two and one half years. It is clear that she has been given proper care and attention and has not suffered any deprivation during that time. The incidents of inappropriate care when in the care of mother, and possibly father, during home visits in late 1989 and January, 1990 are demonstrative of poor judgment and poor parenting skills, as well lack of rehabilitation, but the court does not find that the evidence rises to the standard of clear and convincing proof of deprivation of care.
FAILURE TO REHABILITATE:
Section 17-43a(b)(2) of the General Statutes provides for the termination of parental rights in the situation where a parent of a CT Page 1742 child who has previously been adjudicated as being neglected fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time said parent assume a responsible position in the life of the child, considering the age an the needs of said child. The court finds that the child was adjudicated a neglected child and committed to the custody of the Commissioner of the Department of Children and Youth Services on September 15, 1988. The court further finds clear and convincing evidence that neither Lisa nor Mark has achieved such degree of personal rehabilitation subsequent to that commitment.
"`Personal rehabilitation' as used in the [General Statutes 17-43a] refers to the restoration of a parent to his or her former constructive and useful role as a parent." In Re Migdalia M., 6 Conn. App. 194,203 (1986).
As to the respondent father.
It is clear to the court that father has not made any reasonable efforts to become a significant or meaningful part of the child's life. By his own testimony, even though he was living in the same household with the child, he was totally unaware of the child's plight prior to September, 1988, when she was adjudicated to be neglected and was committed to the custody of DCYS. He testified that he did not know that Lisa was neglecting the child. His ability to observe the child's needs had not improved as the Christmas, 1989 visit when the child was discovered by the foster mother to have a fever of 104.3 degrees. Lisa did not realize that the child was ill and Mark testified that the child had a cold but that she looked fine to him. The judgment and childcare ability of the respondent parents during several of the unsupervised visits with the child in late 1989 and early 1990 leaves much to be desired, and is predictive of their ability to care for the child in the future.
Father has not been involved any meaningful way with Christina over the past year. Indeed, he even refused to acknowledge paternity of the child until a termination petition was filed in May, 1990. He has not made any substantial effort or attempt to see the child since January, 1990, and has not had any significant communication, if indeed there were any at all, with the foster mother or DCYS to ask about the child's welfare.
Dr. Meier found that Mark lacks both parenting skills and an understanding of the needs of the child. There is no parent-child relationship between father and Christina.
Mark has done little or nothing to rehabilitate himself over the past two years, and there is no reason for the court to believe that this father will be in a position to adequately care for or play a meaningful role in the life of the child in the foreseeable CT Page 1743 future.
The court finds that the petitioner has proven the ground of failure to rehabilitate as to the respondent father by clear and convincing evidence, and that this condition has existed for more than one year.
As to the respondent mother.
The gravamen of this ground as it relates to the mother is not whether Lisa loves her child, rather it is whether she can adequately and safely care for and meet the physical, educational and emotional need of the child. The court concludes from the weight and sufficiency of the evidence, taking into consideration the credibility of the witnesses that Lisa can not and will not be able to adequately or safely care for or meet the needs of the child within a reasonable period of time.
Although mother has made efforts over the past two years, with the assistance of numerous service providers, to develop the understanding and parenting skills which are indispensable to safely and adequately caring for and meeting the needs of Christina, it is the finding of the court that Lisa has not developed the parenting skills needed to care for the child and that she is and will remain incapable of safely parenting Christina with the foreseeable future.
On several occasions Lisa has told different persons that she did not believe that she was capable of caring for Christina. Her lack of judgment in caring for Christina during several overnight visits are demonstrative of her lack of ability. Even the respondent father told Dr. Meier that he does not believe that Lisa is capable of caring for the child, and, as indicated, supra, since Mark does not have the parenting skills necessary to care for the child, he would be an inappropriate and inadequate resource to help Lisa in caring for Christina. While mother testified that she believes that she can care for the child without the help of DMR, in point of fact, she cannot even care for herself without the help of that or a comparable agency. She has made little progress over pass two years in developing the skills needed to care for the child and she has no understanding of Christina's basic, much less special, needs.
This is a child who, according to Dr. Meier, has special needs partly because of a lack of consistency and permanency in her life. Christina has been in placement for more than one half of life. She can not afford to wait any longer for the uncertain outcome of long term, if not lifetime, plans and efforts of DMA to attempt to teach her mother how to care for her. The court finds it is unreasonable to require Christina to wait any longer for permanency, given the fact that mother has already had over two years to CT Page 1744 rehabilitate without success.
The respondent mother misapplies the ruling of In re Magalida M.,6 Conn. App. 194 (1980). (Brief at p. 4). This is not a case in which the child has developmental disabilities and the mother has parenting limitations, rather it is a case which the mother has disabilities and resulting parenting limitations. Mother argues, in effect, that the child should be committed to foster care indefinitely and be permitted to have continuing contact with mother, in order to enjoy "the best of both worlds." (Brief at p. 4 and 5). That would only leave the child without permanency and in a perpetual state of uncertainty and confusion. Christina is a child, and like all children has special needs which must be met by knowledgeable and capable adults. Lisa, in many respects, is herself a child who loves but can not meet the needs of her daughter.
The Court finds that because of her borderline intelligence and prior personal history it is most unlikely that mother will ever be able to develop the skills needed to independently care for this child's basic and special behavioral and emotional needs with or without extensive support services. See: In re: Juvenile Appeal (84-7),3 Conn. App. 30, 31 (1984) and In re: Juvenile Appeal (84-3),1 Conn. App. 463, 478 (1984). The court further finds that the petitioner has proven the ground of failure to rehabilitate as to the respondent mother by clear and convincing evidence, and that this condition has existed for more than one year.
Before entering an order of termination, the court must consider the six factors set forth in subsection (d) of Section 17-43a of the Connecticut General Statutes.[1]
 (1) Mother received assistance from at least the following service providers and/or agencies: The Parent Aide Program,; One-on-one parenting training from the foster mother; The Department of Income Maintenance; The Department of Mental Retardation; The Young Parents Program; The Dempsey Center; The Day Kimball Hospital Pediatric and OB/GYN Units; The Northeast Action Community Program; WACAP. In addition, DCYS assisted in providing referrals and a visiting schedule with the child. Even with all of this help she has not been able to develop the skills needed to safely and adequately care for Christina. Father, who would not acknowledge paternity of the child, was not offered services, nor did he seek any, until subsequent to the filing of the termination petition.
 (2) The only court orders entered in this case were to participate in psychological evaluations. Both parents complied with this order.
(3) There is evidence emotional ties between Lisa and CT Page 1745 Christina; however, there is no evidence of any emotional ties between Christina and Mark.
 (4) Christina is four years old with a date of birth of December 23, 1986.
 (5) Mother has maintained contact with the child and with DCYS. However, she has not gained the ability to safely or adequately care for the child over the more than two years Christina has been in placement. Father has not maintained regular contact with either the child nor DCYS.
 (6) Neither parent has been prevented from seeing and maintaining a meaningful relationship with the child by any reasonable act of any person and economic factors were not in issue in this case.
BEST INTEREST OF THE CHILD
Christina, like any child, if entitled and must be permitted to have the opportunity to grow and develop physically, socially, emotionally and intellectually within a secure, permanent nurturing home and family environment, in order to maximize her potential. The court finds clear and convincing evidence that neither parent, individually or together, is or will in the reasonably foreseeable future be capable of providing the child with that environment. As stated by Dr. Meier:
 Christina has been in placement for over 1 1/2 years, and the likelihood of either parent being able to effectively care for her in the foreseeable future is very unlikely. Neither can provide the special care she needs, and neither seems to even be aware of the child's needs. Her greatest need at this time is stability and love in a home which can give her the time and effort necessary to meet her emotional and psychological needs. (Exhibit F).
The court finds that because of mother's deficiencies and mental limitations she is and will be unable to provide the child with necessary care. This child has been in foster care for more than one half of her young life, and according to Dr. Meier's testimony, that is more than the maximum time recommended for temporary placement in foster care for a child of her age. She needs the stability and security of a permanent adoptive home, and that can only be realized by terminating the parental rights of her natural parents. "Termination has been consistently recognized as being in the best interest of the child when the parent has a mental deficiency or illness that renders her unable to provide the child with necessary care." In re: Nicolina T., 9 Conn. App. 598 (1987). CT Page 1746
The court further finds that to require Christina to remain any longer without a permanent, nurturing home and family, and thus in a continual state of uncertainty, would not be in the child's best interest, and indeed would be detrimental to the child. Christina is considered by DCYS to be adoptable and is currently placed in a pre-adoptive home.
JUDGEMENT
Having considered the foregoing, it is found by clear and convincing evidence to be in the best interests of Christina for the parental rights of her mother and father be terminated so that the may be raised in a permanent, secure and nurturing environment as an adopted child.
It is therefore ORDERED that the parental rights of Mark L. and Lisa N. in and to Christina N. are hereby terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child forthwith in adoption, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no later than 90 days from the date of this judgement a report as to the progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.